IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Criminal No. 4:14-CR-103-RWP |
| v. | ) |
| | ) MEMORANDUM IN SUPPORT OF |
| | ) MOTION FOR DOWNWARD |
| KENT L. SORENSON, | ) DEPARTURE UNDER SENTENCING |
| | ) GUIDELINES |
| Defendant. | ) |

The government has moved this Court to depart downward from the United States Sentencing Guidelines (Guidelines) in sentencing defendant Kent L. Sorenson pursuant to Guidelines § 5K1.1 for his cooperation with and substantial assistance to the government. As discussed below, in light of (1) that substantial assistance, (2) the sentences already imposed by another District Judge of this Court upon Sorenson's co-conspirators in *United States v. Benton, et al.,* No. 4:15-CR-103 (S.D. Iowa), and (3) the defendant's inability to pay a fine, the government recommends a downward departure to a sentence of no imprisonment, no home confinement, 80 hours or community service, and no fine, which is a sentence necessary to produce a punishment less severe than that already imposed on the leaders of the conspiracy, who went to trial.

**Background**

On August 27, 2014, defendant Kent L. Sorenson pled guilty to one count of violating the Federal Election Campaign Act (FECA) by causing false statements from the Ron Paul 2012 Presidential Campaign Committee, Inc. (RPPC)[1] to the Federal Election Commission (FEC), 52 U.S.C. § 30109 (former 2 U.S.C. § 434(b)(5)(A)), and one count of obstructing justice in relation

---

1    Former United States Representative Paul's campaign was publicly identified in the trials of *United States v. Benton, et al.,* No. 4:15-CR-103 (S.D. Iowa).

to or contemplation of a federal matter, 18 U.S.C. § 1519, by lying under oath at a video-taped and transcribed deposition conducted by a special counsel to the Iowa State Senate investigating payments to Sorenson by the RPPC and by a political action committee (PAC) associated with former United States Representative Michele Bachmann, another candidate for President of the United States.[2]

In the spring of 2011, Sorenson endorsed then-Representative Bachmann for the Office of President of the United States and became Rep. Bachmann's Iowa campaign Chair. He performed work for her campaign, receiving payment from and reporting to a PAC established by Bachmann. The investigation initially delved into payments by the PAC to Sorenson, and Sorenson admitted that he believed he was paid for his campaign work by the PAC, and the parties agree that is relevant conduct to the charges in this case, which relate to the RPPC campaign.

Beginning in the fall of 2011, the RPPC defendants (Chairman Jesse R. Benton, Campaign Manager John F. Tate, and Deputy Campaign Manager Dimitrios N. Kesai) engaged in a concerted effort to persuade Sorenson to defect from the Bachmann campaign and endorse then-Representative Ron Paul for President. That effort included offers to pay Sorenson.

On December 28, 2011, just days before the Iowa caucuses, Sorenson appeared at a campaign event held by the RPPC and endorsed Paul. The next day, Bachmann went on national television and accused the RPPC of paying Sorenson for his endorsement. Sorenson and the RPPC denied that allegation, and specifically stated that the RPPC's FEC filings would prove that Sorenson received no money from the RPPC.

---

[2]  Former United States Representative Bachmann's campaign was publicly identified in the trials of *United States v. Benton, et al.,* No. 4:15-CR-103 (S.D. Iowa).

In fact, the defendants agreed with Sorenson that he *would* be paid by the RPPC and that those payments would be disguised on the campaign's internal books and externally on FEC reports to avoid the public disclosure that the flat denials of Rep. Bachmann's allegation issued by Sorenson and the RPPC were untrue.

To effectuate this scheme, Kesari arranged for an audio-visual company called Interaction Communication Technology ("ICT") to act as a pass-through entity for the payments to Sorenson. Each month, Sorenson's political consulting company Grassroots Strategy, believed Inc. submitted an invoice to ICT, which then sent its own invoice to the RPPC for Sorenson's fee plus a commission for ICT. The defendants approved the ICT invoices and submitted them to campaign officials for payment and for recording in the campaign records, often by email. The defendants created and executed this plan knowing that the campaign's FEC reports would show only the payments to ICT as "audio/visual expenses" and therefore neither the media nor the public nor Paul himself would know that, contrary to the public pronouncements of both the senator and the campaign, the RPPC did pay Sorenson after he endorsed Paul.

In this manner, the RPPC managed to pay Sorenson $73,000 (an initial payment of $25,000 plus $8,000 per month from January 2012 to June 2012) without having Sorenson's name appear on the campaign's FEC filings. During that time, Sorenson and RPPC did no work for RPPC, let alone type of work by RPPC both internally and at the FEC.

**Substantial Assistance**

Beginning on July 24, 2014, following the execution of a search warrant at Sorenson's home by the Federal Bureau of Investigation (FBI), but before being charged, Sorenson began assisting the investigation of the payments he received for presidential campaign work in the

3

2012 election cycle. After his proffer, Sorenson promptly pled guilty pursuant to plea and cooperation agreements.

Prior to his proffer, Sorenson made generalized, false statements to the FBI that he had done nothing wrong. However, at and after Sorenson's proffer, the investigation found no instance in which Sorenson made a false statement to the prosecution team in the course of numerous interviews and preparation sessions, to the grand jury that heard his testimony, or to the two trial juries that heard his lengthy testimony in the RPPC case. Further, his extensive, truthful testimony at the two jury trials was instrumental in the conviction of all three defendants in the RPPC case.

Sorenson cooperated by sitting for numerous interviews whenever requested by the FBI. He testified in the grand jury. He attended numerous preparation sessions for trial. And, most importantly, he testified for hours at each of two separate trials over eight months. In no instance was the investigation aware that he made any statement that appeared false in light of the other evidence. In fact, the evidence consistently corroborated Sorenson in every material respect.

While Sorenson did understandably confuse certain immaterial details (such as the names of persons present in a meeting), he was consistent in those trivial errors such that the investigation concluded he was honestly attempting to recount his actual memories. At no time did the investigation conclude that Sorenson attempted to tailor his testimony to a false accounting that would have been better for the government.

In short, Sorenson cooperated and testified truthfully. As a direct result, the government proved facts it could not have readily proved without him. Specifically, and most importantly, the government relied on Sorenson virtually alone to prove the substance of his meeting on the day after Bachmann accused the Paul campaign of buying Sorenson's endorsement (i.e. that the

4

conspiracy to conceal the RPPC payments began that day at Paul's Iowa headquarters, and specifically contemplated false FEC reports). Sorenson was also the government's proof of the negative assertion that Sorenson had not actually worked for RPPC. And Sorenson alone put these damning words in defendant Benton's mouth at the time of Sorenson's wrenching betrayal of Bachmann and endorsement of Paul: "You're bleeding for us—we'll take care of you."

**Sentencing Factors**

Under the Guidelines, there are five factors the Court may consider in determining the appropriate reduction under Guidelines § 5K1.1:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a). These factors support a substantial reduction.

Sorenson's assistance was critical to convictions of all of his charged co-conspirators; in a factually complex case that mistried once, Sorenson's testimony was indispensable, especially to convictions of Benton and Tate, for whom the government's most significant email evidence was, ultimately, limited by their use of Kesari to handle Sorenson. Sorenson's testimony was, in light of all the evidence, truthful, complete, and reliable. There was no opportunity for proactive investigation because the search of Sorenson's home became public before he agreed to cooperate; but, once he agreed to cooperate, Sorenson performed every available form of assistance to the investigation when and where the government asked. While he suffered no

5

physical harm or threat as a result of cooperating, Sorenson unquestionably suffered personal loss in the form of public humiliation in his community by admitting his criminal conduct.

Most importantly, however, as the Court indicated by electronic communication to the parties on October 6, 2016, concerning their filings with sentencing information, it is important to consider the sentencing of Sorenson's co-conspirators in their related case. Both to be fair to Sorenson within this case, and to encourage future cooperation by others in other cases, the sentencing of Sorenson's RPPC co-conspirators must be considered. Those sentences require that the government recommend probation.

Specifically, defendant Benton's Pre-Sentence Report (PSR) calculated his Sentencing Guidelines at level 22 (41-51 months); this Court calculated it at level 16 (21-27 months), and departed downward to impose a sentence of two years of probation, six months of home confinement, 80 hours of community service, and a $10,000 fine. Defendant Tate's PSR calculated his Sentencing Guidelines also at level 22; the court again calculated it at level 16, and again departed downward to impose the same sentence as Benton's. Defendant Kesari was by far the most active of all the RPPC offenders throughout the course of their conduct, and his PSR calculated his Sentencing Guidelines at level 24 (51-63 months); this Court calculated it at level 18 (27-33 months), and departed downward to impose a sentence of three months of imprisonment, three months of home confinement, 80 hours of community service, and a $10,000 fine.

To sentence the co-conspirators as it did, this Court effectively halved the offense level of each defendant. Although the Court certainly did so over the government's vigorous objections, it was done. Doing the same for Sorenson, as a starting point, puts him at Guidelines level 10.

Departing only 2 or more further levels for his substantial assistance, makes him eligible for a more lenient sentence than his co-conspirators.

Specifically, Sorenson's PSR calculated his Sentencing Guidelines at level 20 (33-41 months), and finds that he has no ability to pay a fine. Halving that to level 10, then reducing the level by only two or more levels under Guidelines § 5K1.1, makes Sorenson eligible for probation in Zone A of the Guidelines. Regardless of how the Probation Office or the Court calculate the Guidelines for Sorenson, moreover, both specific justice to Sorenson in this case, and general encouragement of cooperation by others in future cases under Guidelines § 5K1.1, require a sentence less punitive than that received by Benton and Tate, who were ultimately responsible for the RPPC offense conduct, even if Kesari was more active.

## Conclusion

Accordingly, given the substantial assistance by defendant Sorenson, the prior judgments of another judge of this Court in a related case (albeit over the government's objection),[3] and defendant Sorenson's inability to pay a fine, the government recommends a downward departure

---

[3] The government notes that it does not intend to bind itself in any way in any other case to the radical Guidelines departures afforded Sorenson's co-conspirators in their related case before another Judge of this Court. While it has determined not to appeal the sentencing in the related case, the government respectfully disagrees with the Court's sentencing analysis in that case as any guide for future sentencings in unrelated cases.

In this regard, and at the Court's request, the government notes, as it did in the related case, the following sentences in campaign finance cases: *United States v. Bigica*, No. 2:12-CR- 00318-FSH (D.N.J. 2012) (defendant sentenced to 60 months' incarceration following guilty plea to tax violation and conduit scheme involving $98,600 in illegal contributions); *United States v. Braddock,* Nos. 3:12-CR-00058-LRH, 3:12-CR-00157-JBA (D. Conn. 2013) (defendant sentenced to 38 months' incarceration following jury trial involving nearly $28,000 conduit scheme; *United States v. Danielczyk*, No. 1:11-CR-00085-JCC (E.D. Va. 2013) (defendant sentenced to 28 months' incarceration following guilty plea for orchestrating $186,600 conduit scheme, causing false statements to the FEC, and obstructing the FEC's investigation); *United States v. Magliocchetti,* No. 1:10-CR-00286 (E.D. Va. 2010) (defendant sentenced to 27 months' incarceration following guilty plea for causing false statements to the FEC and conduit scheme involving $380,000 in illegal contributions over a five-year period).

For more information on the government's position in the related case, see "Government's Omnibus Sentencing Memorandum," *United States v. Benton et al.,* No. 4:15-103, Dkt. 641, filed under seal September 19, 2016 (S.D. Iowa).

of twelve or more levels under the Guidelines as needed to impose upon him a sentence of two years of probation, 80 hours of community service, and no fine.

Respectfully submitted,

RAYMOND N. HULSER
Chief, Public Integrity Section

By:

  /s/ Richard C. Pilger
Richard C. Pilger
Director, Election Crimes Branch
Public Integrity Section
Criminal Division
United States Department of Justice
Tel. (202) 514-1412 (office)
Fax: (202) 514-3003
Email:   richard.pilger@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2017, I
electronically filed the foregoing with the
Clerk of Court using the CM ECF system.  I hereby
certify that a copy of this document was served
on the parties or attorneys of record by:

    U.S. Mail      Fax      Hand Delivery

 X   ECF/Electronic filing    Other means;


RAYMOND N. HULSER
Chief, Public Integrity Section

By:	/s/  Richard C. Pilger
	Richard C. Pilger
	Director, Election Crimes Branch
	Public Integrity Section

Criminal Division
United States Department of Justice