IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | 4:14-cr-00103 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| KENT LEROY SORENSON, | * | SENTENCING MEMORANDUM |
| | * | |
| Defendant. | * | |
| | * | |

## I. INTRODUCTION

On January 17, 2017, this Court sentenced Kent Leroy Sorenson ("Defendant") to a term of incarceration of fifteen months. This memorandum explicates the Court's analysis and reasoning for the sentence.

On August 27, 2014, Defendant pled guilty to one count of willfully causing false reports of federal campaign expenditures in violation of 52 U.S.C. § 30109(d)(1)(A)(i),[1] a class D felony; and one count of falsifying records in contemplation and relation to a federal investigation intending to obstruct justice in violation of 18 U.S.C. § 1519, a class C felony. *See* 18 U.S.C. § 3559. His plea was accepted on September 16, 2014, and this Court is now tasked with crafting a sentence that was "sufficient, but not greater than necessary," to "reflect the seriousness of the offense[s], . . . promote respect for the law, . . . provide just punishment for the offense[s]," and "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2).

---

[1] At the time the Information was filed in 2014, this provision was found at 2 U.S.C. § 437g(d)(1)(A)(i).

## II. FACTUAL BACKGROUND

Defendant first entered public service when he was elected to the Iowa House of Representatives in 2008.  He was subsequently elected to the Iowa Senate in 2010.  Defendant was serving as a state senator leading up to the delegate selection process for the 2012 presidential election.  Defendant was working for Michele Bachmann's presidential campaign as its Iowa campaign chair from March through December 2011.  Though Defendant's work for the campaign was public, his compensation was intentionally hidden from view.  He was first paid by MichelePAC, a political action committee ("PAC") supporting Bachmann's candidacy, and eventually paid by the Bachmann for President committee.

While Defendant worked for the Bachmann campaign, his wages were insulated from scrutiny by funneling the payments through a consulting company in Colorado called C&M Strategies, then transmitting them to Grassroots Strategies, Inc., a corporation Defendant owned, and eventually being withdrawn by Defendant or his wife as individual income.  In all, Grassroots Strategies received nearly $60,000 from C&M Strategies, Defendant and his wife withdrew $30,700 as personal income from Grassroots Strategies, and an additional amount totaling $10,362 was withdrawn from Grassroots Strategies in cash or on checks payable to "Cash."  None of these payments were reported to the Federal Elections Committee ("FEC").  Defendant expressly requested his wages not be reported because he was aware that his acceptance of the payments might have constituted a violation of the Iowa Senate Code of Ethics.[2]

---

[2] Iowa Senate Code of Ethics, Rule 6 provides in part, "A senator shall not accept employment, either directly or indirectly, from a political action committee or from an organization exempt from taxation . . . that engages in activities related to the nomination, election, or defeat of a candidate for public office."

In late 2011, Defendant through several surrogates began to negotiate a change in his presidential endorsement with Ron Paul's campaign.  One of Defendant's surrogates, Aaron Dorr, sent an email to John Tate, Paul's national campaign manager, demanding an $8000 per month salary and a $100,000 donation to the Iowa Conservatives Fund PAC in exchange for Defendant's allegiance.  Paul's campaign chairman, Jesse Benton, replied to the email by decrying the attempted sale of a political endorsement as unethical.  Dorr attempted to guard Defendant from these accusations and responded that Dorr himself, not Defendant, had made the demands.  Regardless, the Paul campaign continued to seek Defendant's endorsement through in-person meetings with Dimitri Kesari, Paul's deputy national campaign manager.

Defendant's transition away from Bachmann's campaign and towards Paul's accelerated in late December of 2011.  On December 26, Kesari personally gave Defendant's wife a $25,000 check, drawn on the account of a retail company owned by Kesari and his wife.  The check was issued in exchange for Defendant's public support of Paul's candidacy and for unspecified work for the campaign.  Defendant held the check but did not cash it.  Around this period of time, Kesari and Defendant agreed that Defendant would receive $8000 per month from the Paul campaign and that the payments would be concealed from the public and the FEC.

   On December 28, Defendant appeared at a Paul campaign event to publicly endorse Paul for the first time.  By the following day, December 29, Defendant came under heavy criticism for his sudden defection and was accused of accepting secret payments in exchange for his endorsement.  Defendant gave media interviews in which he flatly and repeatedly denied being offered payment from the Paul campaign or anyone associated with it.  He denied that he had received any money and asserted the Paul campaign's FEC filings would prove as much.

3

Throughout 2012, Defendant received the additional agreed-upon payments.  Between the $25,000 check and the monthly installments, Defendant received $73,000 in total.  Kesari and his surrogates transmitted the payments to a film production company in Maryland, which would then in turn remit the payments to Grassroots Strategies.  By using this payment scheme, much like the scheme the Bachmann campaign had used to pay Defendant, the Paul campaign omitted Defendant's name and payments from its FEC filings.  By the end of the election cycle that year, Defendant had received $132,915.47 from the Bachmann and Paul campaigns.  None of that amount was reported to the FEC by either campaign.

The following year, on January 28, 2013, a former staff member of Bachmann's campaign filed a complaint with the Iowa Senate Ethics Committee ("Ethics Committee") alleging Defendant violated the Iowa Senate Code of Ethics by accepting payment from Bachmann's committee and from MichelePAC in exchange for his services to the campaigns.[3] On May 1, 2013, the Ethics Committee issued a request to the Chief Justice of the Iowa Supreme Court to appoint an independent investigator to evaluate the allegations in the complaint.  The Chief Justice thereafter appointed Mark Weinhardt as independent counsel to the Ethics Committee.

Weinhardt deposed Defendant on the record on September 19, 2013.  Throughout the deposition, Defendant continued to deny that he received any payment from either the Bachmann or Paul campaign for any services or his endorsement.  When confronted about the payments to Grassroots Strategies from the Maryland film production company, Defendant asserted he was

---

[3] The former staff member also filed two other complaints, one of which was unsubstantiated and the other of which was dismissed.

4

paid as a film location scout and expressly denied the payments were related to Paul's campaign. After memorializing several falsehoods on the record, Defendant invoked the Fifth Amendment and refused to answer further questions or cooperate with the investigation.  After completing his investigation, Weinhardt issued a final report, which concluded there was probable cause for the complaint alleging Defendant was compensated by the Bachmann campaign.  The report also noted Defendant denied he received such compensation on the record, both in writing and at his deposition.

On August 27, 2014, the Government filed the two-count Information in this case.  Count One concerned the falsification of FEC filings in relation to payments made through the Maryland film production company, and Count Two concerned Defendant's false statements and the resulting obstruction of Weinhardt's investigation.  Defendant pled guilty to both counts on the same day pursuant to a plea agreement between himself, the Government, and the State of Iowa.

## III. DISCUSSION

It now falls to this Court to fashion a sentence for Defendant that is "sufficient, but not greater than necessary."  18 U.S.C. § 3553(a).  As the Chief Justice of the United States recently acknowledged, "[m]ost district judges agree that sentencing is their most difficult duty."  Chief Justice John Roberts, *2016 Year-End Report on the Federal Judiciary* 5 (Dec. 31, 2016), https://www.supremecourt.gov/publicinfo/year-end/2016year-endreport.pdf.  "The judge must confront the offender, face-to-face, and take just account of human failing. . . .  In delivering the sentence, the judge speaks as the voice of the community."  *Id.*  The important societal function

sentencing courts perform is reflected by our laws; Congress has tasked sentencing courts with accomplishing the policy goals articulated in 18 U.S.C. § 3553(a)(2).

Section 3553(a) delineates a number of factors that courts must consider when determining an appropriate sentence. *Id.* Those factors include a number of pragmatic concerns: the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the U.S. Sentencing Commission's recommended sentence, expressed through its Sentencing Guidelines ("USSG"), and pertinent policy statements; the need to avoid unwarranted sentencing disparities "among defendants with similar records who have been found guilty of similar conduct;" and the need to provide restitution to victims. *See* §§ 3553(a)(1), (3)–(7). The factors also include the aforementioned policy goals: reflecting the seriousness of the offense; promoting respect for the law; providing just punishment for the offense; adequately deterring criminal conduct; protecting the public from further crimes of the defendant; and providing the defendant with needed care, training, or treatment. *See* § 3553(a)(2).

The Court proceeds by analyzing first the advisory Guidelines range, then the § 3553(a) factors and the parties' motions for a variance, and finally the Government's motion for departure. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . . [A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."); *see also United States v. Coyle*, 506 F.3d 680 (8th Cir. 2007).

6

A.  *Advisory U.S. Sentencing Guidelines Range*

Defendant's base offense level is 8 (on a scale of 1 to 43) as calculated in the Presentence Investigation Report ("PSIR").[4]  The base offense level was increased by eight points based on the value of the illegal transactions ($132,915.47) by two points based on Defendant's abuse of a position of public trust in the offense, and again by two points for the obstruction of justice.  *See* USSG §§ 2C1.8(b)(1), 3B1.3, 3C1.1.  The PSIR's final calculation of the total offense level is 20.

Defendant objects to the PSIR's failure to reduce the total offense level calculation by three points based on his acceptance of responsibility despite the Government's recommendation pursuant to the plea agreement that those reductions be applied.  *See id.* § 3E1.1(a)–(b).  The Guidelines state, "Conduct resulting in an [obstruction] enhancement . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply."  *Id.* § 3E1.1, Application Note 4.  Defendant does not contest the two-point increase based on his obstructive conduct.  *See id.* § 3C1.1.  The dispute, therefore, is whether this is such an extraordinary case.

"[T]he mere fact of the guilty plea to the underlying offense, followed by an absence of post-plea obstructive conduct is not by itself sufficient to establish an extraordinary case as a matter of law."  *United States v. Honken*, 184 F.3d 961, 972 (8th Cir. 1999).  To determine whether there are other facts in this case that would make it extraordinary, the Court "must

---

[4] The base offense level of 8 results by grouping the two counts together pursuant to USSG § 3D1.2(c) and .3(a).

inquire into the particular circumstances of the defendant's case: was the defendant's obstructive conduct a relatively brief or early aberration, or was it a methodical, continued effort to obstruct justice?" *Id.*

In support of its conclusion that this case does not warrant application of the acceptance adjustment, the PSIR notes that Defendant tested positive for marijuana "after the obstructive conduct and the execution of the search warrant." Defendant claims the refusal to include the reduction "is erroneously premised upon the inference that the Defendant was continuing to use marijuana after pleading guilty." However, the PSIR concedes it does not consider "defendant's use of marijuana as a basis to withhold acceptance of responsibility per se." The PSIR further argues the adjustment should not apply because Defendant was initially uncooperative with the Probation Office during its financial investigation.

In support of his requested application of the adjustment for acceptance of responsibility, Defendant cites his resignation from the Iowa Senate, ongoing cooperation with the Government, and provision of financial information to the Probation Office. Defendant further notes he has assisted the Government in other cases by testifying as a Government witness.

Under the circumstances of this case, the Court ultimately concludes the adjustments for acceptance of responsibility should be applied in spite of the concurrent adjustment for obstruction. To be sure, Defendant's obstructive conduct was certainly methodical and could not in any way be characterized as aberrant. But he ultimately turned the corner and demonstrated acceptance of responsibility in ways beyond merely pleading guilty. In particular, his cooperation with the Government in another case strongly distinguishes this case from the Eighth

Circuit's holding in *Honken*.  In this case, "the nature of the . . . obstructive conduct" is egregious and "the degree of . . . acceptance of responsibility" is likewise substantial.  *Id.* at 968.

Defendant also argues the offense level calculation is two points too high because the money he earned from the Bachmann campaign was legal compensation and only the failure to report that income was illegal.  He reasons that the "value of the illegal transactions" contemplated in USSG §§ 2C1.8(b)(1) and 2B1.1(b)(1) should not be $132,915.47, but rather only $73,000, the amount he was paid by the Paul campaign.  The Court rejects this reasoning because the Guidelines' consideration of "the value of the illegal transactions" concerns only the legality of the "transactions."  USSG § 2C1.8(b)(1).  It does not parse the legality of discrete "value[s]" involved in those illegal transactions.  *Id.*  The Court concludes the Guidelines language encompasses the total value of clandestine funds Defendant received from both campaigns that was unreported to the FEC.

Defendant goes on to argue he should be "credit[ed] the fair market value of any services rendered" as in "the ordinary [§] 2B1.1 loss calculation case."  See id. § 2B1.1, Application Note 3(E)(i).  However, this is not an ordinary § 2B1.1 case—it is a § 2C1.8 case, with the attendant differing boundaries and policy objectives.  Therefore, the Court declines to reduce Defendant's total offense level based on a § 2B1.1 loss calculation.[5]

On balance, and in consideration of the Government's recommendation regarding Defendant's acceptance of responsibility, the Court holds that this case is an extraordinary one

---

[5]  The Court further declines to grant a variance from the Guidelines sentence on this reasoning as requested by Defendant.  As noted at the sentencing hearing, even if the Guidelines calculation were adjusted according to Defendant's argument as to the Bachmann campaign payments, the Court's ultimate conclusion of the appropriate sentence in this case would not change.  Application of the factors described in 18 U.S.C. § 3553(a) compel the same result regardless.

and adjusts the total offense level downward by three points—two points under USSG §

3E1.1(a) and one point under USSG § 3E1.1(b).  As a result, Defendant's total offense level is

17.  He has no significant criminal history points and therefore has a criminal history category of

one ("I").  *See* USSG §§ 4A1.1, .2(e).  The Guidelines recommended sentence range is twenty-

four to thirty months' imprisonment followed by one to three years of supervised release and a

fine of between $10,000 and $95,000.  *Id.* §§ 5A, 5D1.2(a)(2), 5E1.2.

### B.   *The § 3553(a) Factors*

With the Guidelines range determined, the Court now considers the parties' requests to

vary from the Guidelines range and the factors of 18 U.S.C. § 3553(a) to craft the appropriate

sentence.  Both parties ask this Court to impose only a sentence of probation, of which the

Government recommends a term of two years.  In addition to a term of probation, both parties

suggest Defendant be required to perform community service.  The Government further

recommends that no fine be assessed against Defendant.  After carefully considering the

§ 3553(a) factors, the Court concludes neither party's suggested sentence is sufficient to achieve

the goals of sentencing.

A number of the § 3553(a) factors are easily evaluated while others require a more

careful analysis.  To begin, the position of the U.S. Sentencing Commission has been fully

considered by calculation of the Guidelines range and consideration of the policies described

therein.  *See* 18 U.S.C. § 3553(a)(4)–(5).  Though the Court rejects the notion that there are no

victims of Defendant's conduct, restitution is not a consideration in this case.  *See id.*

§ 3553(a)(7).  The Court acknowledges three kinds of sentences are available: imprisonment,

probation, and home confinement.  *See id.* §§ 3553(a)(3), 3561(a), 3581(a).  Though the PSIR

refers to a charge and plea of guilty to one count of disorderly conduct in 2015, there is no apparent need to protect the public from further crimes of the Defendant. *See id.* § 3553(a)(2)(C). Defendant is not in need of "educational or vocational training, medical care, or other correctional treatment." *See id.* § 3553(a)(2)(D). As to Defendant's history and characteristics, the PSIR relates that he has been married to his wife since 1989, is father to six children, and has no significant criminal history in the years leading up to the present charges. *See id.* § 3553(a)(1). The remaining § 3553(a) factors require a more exacting examination.

1. *The Nature, Circumstances, and Seriousness of the Offenses*

Congress has directed sentencing courts to consider "the nature and circumstances of the offense[s]" and that the sentence imposed must "reflect the seriousness of offense[s]." *Id.* § 3553(a)(1), (a)(2)(A). The offending conduct in this case—the sale of one's political influence as an elected official and proactive concealment of the transactions from the public and from regulators—can only be described in one way: corruption. Put plainly, "[c]orruption exists when institutions and officials charged with serving the public serve their own ends." Zephyr Teachout, Op-Ed., *Legalized Bribery*, N.Y. Times, Jan. 26, 2015, at A21.[6]

Political corruption is a unique and infectious transgression with rippling and intractable societal consequences. It should be of grave public concern that approximately 74% of

---

[6] At the sentencing hearing, the Government took exception to some of the terminology found in this and other sources discussed by the Court, particularly instances of the word "bribery." The Government noted that Defendant has not been charged with bribery. However, the use of the term "bribery" here—in the plain-language sense and in the context of the cited sources—is clearly not a reference to the statutory crime of bribery; it refers to the practice of exchanging "dollars for political favors." *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985). The Court is not persuaded that Defendant's crimes are merely, in the Government's words, a "transparency violation." Nor is it persuaded by the Government's assertion that Defendant's conduct was less culpable because he sold only his political influence but not his *vote*. The *quid-pro-quo* nature of Defendant's offense conduct is necessarily and properly within the scope of the Court's consideration at sentencing.

11

Americans believe that, in general, "elected officials put their own interests ahead of the country's."  Pew Research Center, *Beyond Distrust: How Americans View Their Government* 72 (2015).  This statistic suggests a nearly casual resignation to systemic political corruption.  To be sure, political corruption is not a uniquely contemporary evil, but begrudging acceptance of it may be.

"The first few American generations . . . saw things very differently; for them, corruption was a 'national fixation.'"  Thomas Frank, *The Best Congress Money Can Buy*, N.Y. Times, Oct. 19, 2014, at BR20.  "[T]he framers saw the avoidance of corruption as an essential organizing principle of our representative democracy."  David Cole, *How Corrupt Are Our Politics?*, The New York Review of Books, Sept. 25, 2014, http://www.nybooks.com/issues/2014/09/25/.  They endeavored to "create a system that would be most likely to be filled with men of civic virtue but avoid creating temptations that might corrode that virtue."  Zephyr Teachout, *Corruption in America* 62 (2014).[7]  To that end, they "buil[t] structural barriers keeping public and personal

---

[7] Professor Teachout collects in her book a helpful compendium of the founders' formative philosophical writings and beliefs on the matter of corruption.  Her primary example is the French political philosopher Montesqueiu, whose name "recurs far more often than that of any other authority in all of the vast literature on the Constitution."  Teachout, *Corruption*, *supra*, at 40 (quoting Bernard Bailyn, *The Ideological Origins of the American Revolution* 345 (1992)).  Understanding the manner in which Montesquieu thought about human nature, government, and corruption are particularly instructive in understanding what corruption meant to the founders.  To Montesquieu, "[t]he fundamental difference between the good and perverted form of government, or good and corrupted state, is the psychological orientation of those that govern."  *Id.* at 41.  He believed those who govern are either self-oriented or public-oriented.  *Id.*  "For Montesquieu, corruption and love of country were opposites."  *Id.*  His concept of love in this sense was not blind patriotism nor rooted in academic learning, but it was a deeper and more intimate sensation that is a foundational requirement of a successful republic.  *Id.*

> One can define this virtue as love of the laws and the homeland.  This love, requiring a continuous preference of public interest over one's own, produces all the individual virtues; they are only that preference.
>
> This love is singularly connected with democracies.  In them alone, government is entrusted to each citizen.  Now government is like all things in the world; in order to preserve it, one must love it.
>  . . . .
> Therefore, in a republic, everything depends on establishing this love . . . .

interests separated," which have survived until today in the form of our anticorruption laws. Frank, *supra*, at BR20.

Keeping political corruption in check has continued to be a matter of public urgency throughout the nation's history. The crushing weight of corruption on the integrity of every democratic element of American governance was a constant concern and could rarely be overstated in the minds of its adversaries. President Roosevelt, speaking to Congress in 1903, said,

> There can be no crime more serious than bribery. Other offenses violate one law while *corruption strikes at the foundation of all law*. Under our form of Government all authority is vested in the people and by them delegated to those who represent them in official capacity. There can be no offense heavier than that of him in whom such a sacred trust has been reposed, who sells it for his own gain and enrichment; and no less heavy is the offense of the bribe giver. He is worse than the thief, for the thief robs the individual, while *the corrupt official plunders an entire city or State*. He is as wicked as the murderer, for the murderer may only take one life against the law, while *the corrupt official and the man who corrupts the official alike aim at the assassination of the commonwealth itself*. Government of the people, by the people, for the people will perish from the face of the earth if bribery is tolerated.

Theodore Roosevelt, *Third Annual Message to the Senate and House of Representatives* (Dec. 7, 1903) (emphasis added).

The Court recognizes that the legal community is presently in the midst of refining its own understanding of what is and what is not corruption. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 359–60 (2010) ("Ingratiation and access . . . are not corruption."); Eugene D. Mazo, *The Disappearance of Corruption and the New Path Forward in Campaign Finance*, 9 Duke J. Const. L. & Pub. Pol'y 259, 261 (2014) ("The [U.S. Supreme] Court has

---

Charles de Secondat, Baron de Montesquieu, *The Spirit of the Laws* Book 4, ch. 5 (Anne M. Cohler *et al.* trans., Cambridge Univ. Press 1989) (1748).

defined corruption inconsistently . . . .  Meanwhile, scholars have put forth their own competing

definitions of corruption, conflicting ideas of how the Court should define the term, and,

following a new line of inquiry, competing views of how the term would have been understood

by the framers."); *see also* Lawrence Lessig, *What an Originalist Would Understand*

*"Corruption" to Mean*, 102 Cal. L. Rev. 1 (2014); Zephyr Teachout, *The Anti-Corruption*

*Principle*, 94 Cornell L. Rev. 341 (2009).  However, there is no doubt that Defendant's conduct

falls within the scope of the term under any definition.  "The hallmark of corruption is the

financial *quid pro quo*: dollars for political favors."  *McCutcheon v. Fed. Election Comm'n*, 134

S. Ct. 1434, 1441 (2014) (quoting *Fed. Election Comm'n v. Nat'l Conservative Political Action*

*Comm.*, 470 U.S. 480, 497 (1985)).  Accepting "dollars for political favors," particularly for

elected officials, is the antithesis of civic virtue.

Therefore, the Court concludes that Defendant's conduct, viewed through the lens of

America's traditional understanding of the profound evils of political corruption, requires a

substantial sentence.  This Court cannot countenance a sentence of probation as requested by the

parties.  Such a sentence would in no way "reflect the seriousness" of Defendant's offenses.  18

U.S.C. § 3553(a)(2)(A).  It would simultaneously erode, if only by an increment, America's

foundational, utter rejection of tolerance for corrupt governance.  As Chief Justice Roberts noted,

this Court, in discharging its duty to sentence Defendant, must act as the voice of the community.

When it comes to political corruption, the community—historically and presently—requires that

real, tangible, and severe consequences meet those who gain a position of public trust and then

abuse that trust for personal gain.  Unless that traditional principle is honored, political

corruption will slowly corrode the foundations of our democracy until it collapses under its own

weight.  Based on these considerations, the Court concludes a term of incarceration is required in this case.

2. *Deterring Criminal Conduct and Promoting Respect for the Law*

Congress has further directed sentencing courts to consider "the need for the sentence imposed . . . to promote respect for the law, and . . . to afford adequate deterrence to criminal conduct."  *Id.* § 3553(a)(2)(A)–(B).  These considerations are of particular importance in this case.  It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.  When a corrupt office holder receives too lenient a sentence, the public understandably loses confidence in the integrity of its system of government.  And it sends a signal to other elected officials and public servants that they can have one free bite at the apple when it comes to accepting money for political favors.  *See United States v. Morgan*, 635 F. App'x 423, 451 (10th Cir. 2015) (concluding a sentence of probation was unreasonable and "encourage[d] rather than discourage[d] [public officials] from engaging in [bribery] because they might conclude that the only penalt[y] they will face if they are caught [is probation]").  Sentencing corrupt office holders to a colloquial "slap on the wrist" may over time exacerbate an endemic cycle of corruption.

In addition to promoting respect for anticorruption laws and deterring individuals in positions of political clout—especially elected officials—from engaging in corrupt behavior, strict sentences also serve to protect the public from further harm.  The PSIR states there are "no identifiable victims in this offense."  The Court recognizes that this language is used in an idiosyncratic legal context related to restitution, but it is also compelled to explicitly

15

acknowledge that in a broader sense, there are many identifiable victims in this case.  As District

Judge Caproni of the Southern District of New York recently explained at sentencing in a

corruption case, "no one can say that the people . . . did not suffer tangible harm from [the]

corruption.  But . . . whether or not there was any tangible harm, there was incalculable

intangible harm to [the] people . . . ."  *United States v. Silver*, No. 1:15-cr-00093 (S.D.N.Y.

2016).

Through his actions, Defendant has demeaned the integrity and work ethic of the many

public servants in his community who strive each day to improve life and governance for their

fellow Iowans.  And he has damaged the political morale of his constituency, of all Iowans, and

of all Americans.  The deviant acts of the corrupt public official are of course horrific, "but a

hundred times worse is the demoralization of our people which results."  Justice Louis Brandeis,

*Speech to the Good Government Association* (1903).  The public is also harmed "[w]hen trust in

our institutions is low" due to "the corrosive influence of money in our politics" because that

lack of trust has become an integral part of a political climate that is "so corrosive that people of

good character aren't even willing to enter into public service."  Barack Obama, *Farewell

Address* (Jan. 10, 2017).

Given the risk of future harm to the public if political corruption—such as that committed

by Defendant—is not stymied, the Court concludes a term of imprisonment must be imposed to

engender respect for our anticorruption laws and to deter others from engaging in similar

criminal conduct.

3.   *Avoiding Unwarranted Sentence Disparities*

Another factor Congress has instructed sentencing courts to consider in crafting appropriate sentences is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6). This factor is unusually perplexing in this case due to the nature of the sentences imposed on Tate, Benton, and Kesari following their convictions at trial for their roles in Defendant's political corruption scheme in U.S. District Court for the Southern District of Iowa case number 4:15-cr-00103.  Indeed, both parties base their arguments in support of a probation sentence primarily upon maintaining some form of continuity between the sentences received by the three Paul campaign staffers and the sentence to be imposed in this case.

The Government refers to the Paul campaign staffers' trial as a "related case," and Defendant asserts the three staffers are his "co-defendants."  However, the staffers were indicted, tried, and sentenced separately from Defendant, and they are not in a procedural sense his co-defendants.  It is not clear to what extent the parties believe the staffers' sentences are entitled to greater consideration than sentences of "defendants with similar records who have been found guilty of similar conduct."  But this Court has not identified nor have the parties cited to any legal basis for giving greater weight to the staffers' sentences under § 3553(a)(6).  The Court agrees with the Government that "the sentencing of [Defendant's] co-conspirators[8] must be considered."  But it disagrees with the Government that it is "constrained" by those sentences to impose a similar one in this case.

---

[8] The Court issued a finding in the staffers' case that Defendant was a participant in a conspiracy, i.e., the illicit payment scheme; however, Defendant was not charged with conspiracy in the Information.

The Government asserts the Guidelines range applicable to Benton and Tate was between twenty-one and twenty-seven months of incarceration.  The Court ultimately imposed sentences with terms of probation and home confinement but no terms of incarceration.  As to Kesari, the Government asserts the applicable Guidelines range was between twenty-seven and thirty-three months.  The Court ultimately imposed a sentence of three months of incarceration with an additional term of home confinement.

The Government appears to have attempted to reverse engineer the Court's methods in reaching its sentencing determinations in the staffers' case.  It claims the Court "effectively halved the offense level of each defendant."  *See* Government's Memorandum, Clerk's No. 61-1 at 6.  It therefore suggests the same methodology be applied to Defendant.  However, the Court confesses its difficulty following the Government's rationale on this matter for a number of reasons.  First, it is not at all clear from the record in the staffers' case that any sentencing conclusions were reached by "halving" any number.  Second, the Government asserts no basis in law upon which this Court might conclude the degree of variance allowed in a separate case with different facts and different defendants somehow constrains its application of the § 3553(a) factors in this case.

Third, the Government appears to believe its own analysis is "radical" and is improper outside of this case.  In its motion for departure, the Government stated that the variances applied to the staffers' sentences were "radical"[9] and that it "respectfully disagrees with the Court's

---

[9] The Government initially described the staffers' sentences as "radical Guidelines *departures*" in its briefing.  But at the sentencing hearing, the Government conceded that it was in fact referring to *variances* applied by the Court.

sentencing analysis in that case as a guide for future sentencings in unrelated cases."[10]  To summarize, the Government argues that radical variances should not have been applied to the staffers and should not apply to any other defendants; however, it recommends application of precisely that kind of variance *exclusively* to Defendant in order to permit him to avoid a term of incarceration.  The Court disagrees with that recommendation.

Fourth, the Government has not referred the Court to any cases—other than the Paul campaign staffers' case—concerning similar charges that would support a sentence with no term of incarceration.  The cases it cites have all resulted in terms of incarceration of at least 27 months.  *See United States v. Braddock*, No. 3:12-CR-00157-JBA (D. Conn. 2013) (38 months' incarceration); *United States v. Danielczyk*, No. 1:11-CR-00085-JCC (E.D. Va. 2013) (28 months' incarceration); *United States v. Bigica*, No. 2:12-CR-00318-FSH (D.N.J. 2012) (60 months' incarceration); *United States v. Magliocchetti*, No. 1:10-CR-00286 (E.D. Va. 2010) (27 months' incarceration).  Based on the results in those and other federal cases,[11] the Court concludes that contrary to the Government's position, *declining* to impose a term of incarceration in this case would create unwarranted disparity amongst defendants with similar records found guilty of similar conduct.  The Paul staffers' sentences are the *exception*, not the rule, for similarly situated defendants.[12]

---

[10] Insofar as the Government's argument hinges on its characterization of Defendant's case as "related to" the campaign staffers' case, as opposed to being "unrelated," the Court emphasizes that § 3553(a)(6) contemplates no such distinction.

[11] *See, e.g.*, *United States v. Silver*, No. 1:15-cr-00093 (S.D.N.Y. 2016); *United States v. Pan*, No. 1:12-cr-00153 (S.D.N.Y. 2013); *United States v. Odom*, No. 3:12-cr-00076 (N.D. Fla. 2013); *United States v. Feiss*, No. 0:11-cr-60282 (S.D. Fla. 2012); *United States v. Tigani*, No. 1:11-cr-00042 (D. Del. 2012); *United States v. Whittemore*, No. 3:12-cr-00058 (D. Nev. 2012).  Additionally, the PSIR states that 93.3% of defendants convicted of obstruction of justice in the Southern District of Iowa received a sentence of imprisonment in fiscal year 2014.

[12] The Court applies the same reasoning to its determination of the proper sentence adjustment pursuant to its grant of the Government's motion for a departure under USSG § 5K1.1.

As a final consideration on the issue of unwarranted disparity, the U.S. Supreme Court has held it is instructive to consider the § 3553(a)(6) factor in its inverse: the "need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated." *Gall*, 552 U.S. at 55. There are a number of factual considerations in this case that lead this Court to conclude that the staffers were not similarly situated to Defendant such that a divergence from their sentences is warranted. Importantly, Defendant was the recipient of the illicit funds. In the *quid pro quo* arrangement in this case, the Defendant was the direct beneficiary. The three campaign staffers, while instrumental in arranging the flow of the money, did not personally receive any of the funds at issue. And Defendant's surrogate, Dorr, initially attempted to syphon even more money from the Paul campaign by demanding $100,000 for a PAC controlled by Defendant and Dorr. In light of all the circumstances surrounding Defendant's defection to Paul's campaign, the Government's suggestion that Defendant should be seen as less culpable than the three staffers defies credulity.

And there is one more obvious and consequential distinguishing fact: Defendant was a publicly elected official at the time of his offense conduct, which comes with it the immense burden and privilege of stewarding unequalled public trust. The Paul campaign staffers, though directly involved in the political process through Paul's campaign, neither held nor sought public office at the time of their offending conduct. Defendant's status as an elected official—purportedly a vessel of his constituency and working primarily for its benefit—requires he be held to an elevated standard of conduct. On this basis alone, the Government's suggestion that this Court must impose a sentence of probation on Defendant in order to reflect the sentences it imposed on the staffers is not persuasive. The Court is instead challenged with crafting a

20

sentence in entirely unique circumstances.  To illustrate that point, according to the U.S. Sentencing Commission's records, USSG § 2C1.8 has only been applied fifty-nine times in the last decade.[13]  According to those records, not even once has § 2C1.8 been applied to an elected official in those ten years.  In that respect, sentences imposed in other cases, and especially the sentences imposed in the staffers' case, are of limited value to the Court in fine-tuning an appropriate sentence for Defendant.

In full consideration of the circumstances of this case, the Paul campaign staffers' case, and other cases involving similar offense conduct, the Court concludes the need to avoid unwarranted sentence disparities described in § 3553(a)(6) does not compel the imposition of a sentence with no term of incarceration.

4. *Just Punishment for the Offense*

As the above discussed considerations coalesce, the Court must make a final determination of the sentence that is "sufficient, but not greater than necessary, . . . to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  In the Court's judgment, a term of incarceration is required to reflect the seriousness of the offense, to promote respect for our anticorruption laws, and to deter systemic political corruption.

> The exposure and punishment of public corruption is an honor to a nation, not a disgrace.  The shame lies in toleration, not in correction. . . .  If we fail to do all that in us lies to stamp out corruption we cannot escape our share of responsibility for the guilt.  The first requisite of successful self-government is unflinching enforcement of the law and the cutting out of corruption.

---

[13] *See* E-mail from Glenn Schmitt, Director of Office of Research and Data, U.S. Sentencing Comm'n, to Court (Dec. 22, 2016, 15:05 CST) (attached to this memorandum).

Roosevelt, *Third Annual Message*, *supra*; *see Silver*, No. 1:15-cr-00093 (S.D.N.Y.) ("There's so much money sloshing around government right now that it's very difficult to have confidence that any decision is being made on the merits.  That doubt about whether our public servants are operating in our interests or whether their vote is available for purchase to the highest bidder is magnified every time we see another politician exposed as corrupt.").

Defendant has filed numerous letters of support and has presented arguments requesting leniency for the sake of his family.  The Court is sympathetic toward those who will be adversely affected by Defendant's incarceration, most notably his wife, children, and extended family.  However, his incarceration is a natural and foreseeable result of the kind of conduct in which Defendant engaged.  Defendant cannot escape an otherwise just sentence by propping up his family to invoke undue sympathy.

Defendant also argues he has been subjected to criticism in the press, that his reputation has been irrevocably damaged, and that he and his family are in dire financial straits as a result of his scandal.  The Court rejects the suggestion that these collateral consequences of Defendant's legal entanglements should afford him any leniency in this sentencing.  *See United States v. Musgrave*, 761 F.3d 602, 608–09 (6th Cir. 2014) (rejecting sentencing court's rationale that the defendant "had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life" and describing those circumstances as "[i]mpermissible considerations" in the context of sentencing).  "[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."

*United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see Morgan*, 635 F. App'x at 446 ("None of these collateral consequences are properly included in [the] sentence. They impermissibly favor criminals . . . with privileged backgrounds.").[14]

The Guidelines recommend a term of imprisonment between twenty-four and thirty months. "The guidelines are so high because corruption attacks the very heart of our system of government." *Silver*, No. 1:15-cr-00093 (S.D.N.Y.). The Court concludes twenty-four months' incarceration is a "just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

C. *Motion for Departure*

The Government has filed a Motion for Downward Departure pursuant to USSG § 5K1.1. The Guidelines provide that sentencing courts may depart from a recommended sentence to account for a defendant's "substantial assistance in the investigation or prosecution of another person who has committed the offense." *Id.* § 5K1.1. The Guidelines also include five nonexclusive factors courts may consider when evaluating a motion on that basis: (1) "the significance and usefulness of the defendant's assistance;" (2) "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;" (3) "the nature and extent of the defendant's assistance;" (4) "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;" and (5) "the timeliness of the defendant's assistance." *Id.* § 5K1.1(a)(1)–(5).

---

[14] The Court is cognizant of the fact that there is disagreement amongst the Circuit Courts of Appeals as to whether consideration of collateral consequences is impermissible or discretionary. *Compare Prosperi*, 686 F.3d at 47 (concluding consideration of collateral consequences is proscribed), *with United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (concluding consideration of collateral consequences was proper in crafting a just sentence). Neither the U.S. Supreme Court nor the Eighth Circuit has decided the issue. Regardless, the Court concludes that even if their consideration is proper, the collateral consequences suffered by Defendant are not so onerous relative to his conduct that his sentence should be lessened.

Defendant's assistance to the Government's prosecution of Benton, Tate, and Kesari for their role in the conspiracy surrounding the Paul campaign's payments to Defendant is not disputed. He testified before two grand juries and in two jury trials, the first of which resulted in mistrial. The application of the Guideline factors to the facts of this case is straightforward. As to the first, the Government characterizes Defendant's testimony as "indispensable" to its ultimate success in proving the guilt of the three staffers. As to the second, nothing in the record contradicts the Government's assertion that the testimony was "truthful, complete, and reliable." As to the third, Defendant's cooperation was extensive, including grand jury and trial testimony, FBI interviews, and trial preparation. As to the fourth, Defendant suffered no physical injury or risk of physical injury for his cooperation; though the Government asserts the Court should consider his public humiliation to be a form of injury. As to the fifth, the Court finds Defendant's assistance was far from timely due to his long-term obstructive conduct throughout 2013 and 2014.

In consideration of these five factors and all other circumstances in this case, the Court agrees that a departure from the guidelines range is warranted pursuant to USSG § 5K1.1. Therefore, the Government's Motion for Downward Departure is granted.

However, in granting the motion, the Court need not and does not agree with the Government regarding the proper degree of departure in this case. Even when a departure is warranted, "[t]he appropriate reduction shall be determined by the court." *Id.* § 5K1.1(a). In this case, the Court has determined that Defendant's assistance was substantial enough to warrant a reduction of approximately thirty-five percent to the term of incarceration imposed following

evaluation of the § 3553(a) factors.  Defendants' sentence is therefore reduced from twenty-four months' to fifteen months' incarceration.

## IV. CONCLUSION

The Court has fully considered the advisory Guidelines range, each of the § 3553(a) factors, and the unique circumstances of this case.  After adjusting Defendant's sentence by approximately thirty-five percent pursuant to the Government's granted motion for a departure, the Court concludes the proper term of imprisonment is fifteen months.

It is the judgment of this Court that Defendant be sentenced to a term of imprisonment of fifteen months to be followed by a one-year term of supervised release.  The Court imposes $200 in mandatory special assessments for the Crime Victims Fund and no fine.  The sentence imposed is "sufficient, but not greater than necessary," to achieve Congress's policy goals set forth in 18 U.S.C. § 3553(a).

Dated this 17th day of January, 2017.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT