IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :
                             :
          Plaintiff,         :     Criminal No. 4:14-103
                             :
     vs.                     :
                             :
KENT LEROY SORENSON,         :     TRANSCRIPT OF SENTENCING
                             :
          Defendant.         :
- - - - - - - - - - - - - -X


                              Fourth Floor, South Courtroom
                              United States Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa  50309
                              Tuesday, January 17, 2017
                              10:33 a.m.



BEFORE:  THE HONORABLE ROBERT W. PRATT, Senior Judge.


APPEARANCES:

For the Plaintiff:            RICHARD CHRISTIAN PILGER, ESQ.
                              U.S. Department of Justice
                              Criminal Division
                              1400 New York Avenue NW
                              Suite 12100
                              Washington, D.C.  20005

For the Defendant:            F. MONTGOMERY BROWN, ESQ.
                              F.M. Brown Law Firm
                              1001 Office Park Road, Suite 108
                              West Des Moines, Iowa  50265



             Terri L. Martin, CSR, RPR, CRR
              United States Court Reporter
               Room 189, U.S. Courthouse
                123 East Walnut Street
              Des Moines, Iowa  50309

E X H I B I T S

| DEFENDANT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| A - Jeannine Sorenson affidavit | 15 | 15 |
| B - Kevin Anthofer affidavit | 15 | 15 |
| C - Photos of Kent Sorenson | 15 | 15 |
| D - Text messages | 15 | 15 |
| E1 - Role with Bachmann campaign | 15 | 15 |
| E2 - Bachmann for President | 15 | 15 |
| F1 - FBI Grand Jury material | 15 | 15 |
| F2 - FBI interview of Sorenson | 15 | 15 |

P R O C E E D I N G S

(In open court, with defendant present.)

THE COURT:  Please be seated.

Good morning.

MR. PILGER:  Good morning.

MR. BROWN:  Good morning, Your Honor.

THE COURT:  Mr. Sorenson, have you read the presentence report that was prepared in your case?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you had sufficient time and opportunity to discuss the report with Mr. Brown?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  And Mr. Brown, have you read the report in this case?

MR. BROWN:  Yes, Your Honor.

THE COURT:  And have you had enough time to talk to the defendant about the report?

MR. BROWN:  Yes, Your Honor.

THE COURT:  Mr. Pilger, we've not met.  Good morning.

MR. PILGER:  "Pilger."  Good morning, Your Honor.

And for the record, I regret the delay this morning.

THE COURT:  All right.  Mr. Pilger, have you read the report on behalf of the United States?

MR. PILGER:  Yes, Your Honor.

THE COURT:  Mr. Sorenson, it's important to me that

1   you understand what materials I've had.  Even though Mr. Brown

2   is well familiar with this process, it's important to me that

3   you understand it.  I have a brief and submitted exhibits from

4   Mr. Brown which I'm sure he'll be offering.  Some of those or

5   all of those are under seal for reasons that Mr. Brown thought

6   deserved sealing even though public transparency is a large part

7   of our practice here.  Mr. Brown's legal arguments have been

8   placed in the brief, and I believe there are seven exhibits that

9   he gave me.

10        Additionally, since that time, last Friday afternoon

11   Mr. Brown forwarded to me a number of letters.  The first letter

12   is unsigned.  However, it begins by saying, I'm writing this

13   letter on behalf of my brother.  I read the presentence report,

14   of course, and it said you had two sisters, so I was unfamiliar

15   with who was the signer of that letter.

16        The second letter is a letter from your mother.  It as

17   well is unsigned.

18        The next thing I have is a letter from -- and

19   Mr. Brown, maybe you can help me here.  Kathy -- I can't make

20   out the spelling of the last name.

21        THE DEFENDANT:  That's Cathy Frish.  That would be my

22   mother-in-law.

23        THE COURT:  Okay.  The next one is a letter from Eric

24   Durbin; and then I have letters from Michael and Rebecca

25   Wachtel, W-A-C-H-T-E-L; a letter from Danny Carroll; a letter

1  from Brad Cranston; and a letter from Kerry and Kristi Northway;

2  and then a letter from Warren and Susan Hale.

3          Mr. Pilger, did you receive copies of all of the

4  materials that the court has?

5          MR. PILGER:  Yes, Your Honor.

6          THE COURT:  Additionally, Mr. Sorenson, Mr. Pilger has

7  filed a motion for departure from the sentencing guidelines and

8  a brief that tells me the government's position on sentencing.

9          Counsel, I have a question that I am perplexed about.

10  The plea agreement includes the State of Iowa.  The plea

11  agreement is signed by John P. Sarcone, the Polk County

12  Attorney.  It wasn't referred to in the PSR, but I went back and

13  read the plea agreement.

14          What was the reasoning with respect to the State of

15  Iowa being a party to the plea agreement?

16          MR. PILGER:  Your Honor, it was possible that the

17  State of Iowa could have brought charges against Mr. Sorenson

18  out of the offense conduct and related conduct, so in order to

19  reach a global position across the sovereigns, Mr. Sarcone

20  entered into the plea agreement on behalf of the State of Iowa

21  as the Polk County authority.

22          THE COURT:  All right.  He's had no input, I take it,

23  into the sentence here?

24          MR. PILGER:  He has not requested nor has he weighed

25  in on the sentence.

1          THE COURT:  Okay.

2          MR. PILGER:  He has not requested to.  The Federal

3    Government being most familiar with Mr. Sorenson's cooperation,

4    we're proposing the sentencing position.

5          THE COURT:  Okay.  And the exposure that he had under

6    state law, would they be similar statutes involving fraud,

7    obstruction of justice, or what was the --

8          MR. BROWN:  It would have been misconduct in office,

9    Your Honor, that Mr. Weinhardt identified in his investigation.

10          THE COURT:  Okay.

11          MR. BROWN:  Receipt of the payments in violation of

12    Rule 6, Senate Rules.

13          THE COURT:  All right.  And then I think both the PSR

14    and the plea agreement refer to consideration that the spouse

15    wouldn't be prosecuted?

16          MR. BROWN:  That's correct, Your Honor.

17          THE COURT:  Okay.

18          MR. BROWN:  And that's because Ms. Sorenson actually

19    was the recipient of the check from Mr. Kesari at the restaurant

20    in Altoona.

21          THE COURT:  Okay.

22          MR. BROWN:  That was not reported on the FEC

23    requirements.

24          THE COURT:  All right.  That helps me.  Thanks very

25    much.

1          Mr. Pilger, dealing with substantial assistance here,

2   I'm sure Mr. Brown has perhaps told you this, and I know it

3   varies from district to district but probably balkanized; but we

4   usually operate here on percentages, and the U.S. Attorney has

5   made it a practice, I believe, of having a committee to

6   recommend a percentage.

7          Can you tell me how you arrived at your

8   recommendation?  Did you have a committee?  Is it just your

9   sense of what's appropriate or -- I would like to be in a better

10  position to understand.

11         MR. PILGER:  Yes, sir.  The Criminal Division also

12  operates -- the Criminal Division of Main Justice also operates

13  with a committee in each litigating section.

14         THE COURT:  Okay.

15         MR. PILGER:  I'm here from the Public Integrity

16  Section of the Criminal Division.  Our committee is composed of

17  all of the supervisors in the section, and our practice is

18  typically to do what the district would do.  However, in this

19  case, because of the constraints the government feels arise from

20  the sentences on the co-conspirators by another judge of this

21  court, we have not articulated the downward departure in terms

22  of percentages.

23         THE COURT:  Okay.  We're going to get to this probably

24  in our discussion here, but this wasn't charged as a conspiracy

25  with respect to Mr. Sorenson and, in fact, the PSR says there

1  are no co-defendants.  So what's the -- I mean, do you think

2  that -- I mean, to my way of thinking, 3553(a)(6) says

3  defendants convicted of similar offenses.  I assume this is

4  similar offenses --

5          MR. PILGER:  Yes, Your Honor.

6          THE COURT:  -- to the three other defendants that

7  you're referring to, am I right?

8          MR. PILGER:  Yes, sir.

9          THE COURT:  Okay.

10          MR. PILGER:  So in the substantive counts of the

11  superseding indictment on which the other co-conspirators were

12  convicted, you will see very similar offenses.  In fact, the

13  same two offenses at issue before this court today, the former

14  Title 2, now Title 52 offense --

15          THE COURT:  Right.

16          MR. PILGER:  -- was charged against each of them.

17  They were each convicted.  And the Title 18 offense, Section

18  1519, to which Mr. Sorenson pled guilty was also charged in that

19  superseding indictment, and the other -- the co-conspirators

20  stand convicted there.

21          While conspiracy was not charged against Mr. Sorenson,

22  another judge of this court did find that he was a participant

23  in a conspiracy with the three convicted defendants in other

24  proceedings before this court as an evidentiary matter as we

25  proceeded in that case and those defendants stand convicted of

1   that conspiracy.

2           THE COURT:  Okay.  So your point being that they

3   were -- "they," Mr. Tate, Mr. Kesari, and Mr. Benton -- were

4   convicted of the same, causing a false FEC report to be filed

5   and, two, what I consider obstruction of justice?

6           MR. PILGER:  Yes, Your Honor.

7           THE COURT:  Okay.

8           MR. PILGER:  The objection of which they were

9   convicted is premised on two types of records; one being the

10  internal campaign records of the Ron Paul 2012 Presidential

11  Campaign Committee, Inc., and the other being the FEC.

12          THE COURT:  Okay.  Now, Mr. Sorenson, I know that the

13  lawyers and I when we talk about guidelines and similarly

14  situated defendants, et cetera, is confusing; but I want you to

15  know it's a necessary part of our work because Mr. Pilger on

16  behalf of the government has a right to appeal this sentence to

17  the Court of Appeals, Mr. Brown on your part also has the right

18  to appeal the sentence to the Court of Appeals, and what we put

19  on the record, that is, Ms. Martin is taking down my words and

20  the rest of our record here, is important to preservation of

21  error.  And so if we lapse into law talk, it's a necessary part

22  of our work.

23          I don't want you to overlook the fact that I'm fully

24  aware of what the Chief Justice said on New Year's Eve.

25  Sentencing is the most difficult thing that we judges do, and

1  sometimes I think defendants and the public at large doesn't

2  understand that discussion of guidelines and statutes and cases

3  may be dry to you, but it's essential to Mr. Pilger and

4  Mr. Brown's work.

5          Do you understand that?

6          THE DEFENDANT:  Yes, Your Honor.  Over the last few

7  years, I've realized that when the legal jumbo starts to come

8  out, I just have to trust my attorney.

9          THE COURT:  Now, Counsel, I have two objections -- I

10  guess I have three objections to the advisory guidelines.  Tell

11  me if I'm right.  One, both of you urged in the plea agreement

12  that Mr. Sorenson should be given acceptance of responsibility

13  based upon his plea of guilty to the two statutes and based upon

14  his cooperation with the government after his plea, and then

15  Mr. Brown has raised the question about whether or not the money

16  received from Ms. Bachmann's campaign, Congresswoman Bachmann's

17  campaign should be considered part of the -- the guideline

18  refers to, quote, illegal transactions.  So Mr. Brown has asked

19  for a reduction based upon that point.

20          Do I have all of the objections to the advisory

21  guideline --

22          MR. PILGER:  Yes, Your Honor.

23          MR. BROWN:  Yes, Your Honor.

24          THE COURT:  Okay.  Do you want to make any further

25  argument or submission, testimony on either of those guideline

1  matters?  You both briefed them.  If you want to expand on that,

2  I'm certainly willing to listen.  I think I have an

3  understanding of what's at issue.

4       MR. BROWN:  Just briefly, Your Honor.  On the

5  acceptance of responsibility point, it's not unusual for a

6  defendant who's out on pretrial release to test positive, have

7  that pretrial release revoked and still receive acceptance of

8  responsibility at sentencing, and I've cited a specific case in

9  my brief where that occurred, and I have others that that's

10 occurred in.  So I don't believe that Mr. Sorenson's marijuana

11 positive test results after the plea should result in a denial

12 of acceptance of responsibility.

13      I believe that the inclusion of the Bachmann for

14 President monies overrepresents the loss, so to speak, under

15 2B1.1 by at least two levels.  Mr. Sorenson did a tremendous

16 amount of work for that campaign, and even though those payments

17 to him were paid to him circuitously and secretly and in

18 violation of FEC rules by the Bachmann campaign, he did do the

19 work, and the guidelines do give him credit for that as I cited

20 for fair market value.

21      And for those reasons I believe that those numbers

22 from the Bachmann for President campaign, which that campaign

23 failed to disclose potentially to the FEC, does overrepresent

24 the loss in this matter.

25      THE COURT:  Okay.  Mr. Pilger, did you want to comment

1  on either the acceptance guideline or the, what I'll call

2  illegal guideline transaction?

3        MR. PILGER:  We agree with counsel for Mr. Sorenson on

4  the acceptance of responsibility point.  The positive test for

5  marijuana came shortly after Mr. Sorenson signed up, and it's

6  not uncommon for that substance to remain in the system for

7  quite some time.  We do not discredit Mr. Sorenson's accounting

8  for that.

9        I must disagree briefly with counsel for Mr. Sorenson

10  on the money from the Bachmann campaign.  I'll try to keep this

11  brief, but there was a different mechanism there.  It involved a

12  PAC.  PACs are constrained to contributing no more than $5,000

13  to the authorized committee of a candidate.  So, in fact, PACs

14  can't fund someone working for a campaign more than $5,000.

15  That did happen here.  Now, Mr. Sorenson's intent as to that is

16  definitely at issue.  We do not discredit his statements on

17  that; but for purposes of sentencing, I think the evidence is

18  sufficient for a preponderance to include that as relevant

19  conduct.

20        THE COURT:  All right.  Thanks very much.

21        Okay.  The next issue is whether or not there are any

22  departures from the advisory guideline.  What I'm going to do is

23  listen to you about all of these issues and then read into the

24  record my sentence.

25        So the departure is the government's burden.  So,

1  Mr. Pilger, again, you can rest on your submission which came

2  last week or you can expand and supplement it in any way you

3  think appropriate.

4        MR. PILGER:  The government will rest on the

5  submission, unless Your Honor has any questions, and I stand

6  ready to answer any of those.

7        THE COURT:  No.  Again, there was nothing about

8  percentages, but --

9        MR. PILGER:  I can do that for you quickly, Your

10  Honor.

11        THE COURT:  No, it's not necessary, if you just

12  think -- if you think that the way that you submitted your brief

13  is sufficient, I don't want to have you expand on it.  I just

14  want you to have the opportunity.

15        MR. PILGER:  Let me just highlight something in the

16  brief.

17        THE COURT:  Yes.

18        MR. PILGER:  If you start from Judge Jarvey's starting

19  point in the related proceedings --

20        THE COURT:  Mr. Pilger, let me interrupt.  If I did

21  that, how could I comply with the Supreme Court's directive in

22  Gall?

23        MR. PILGER:  You don't have to, Your Honor.  This is

24  entirely discretionary.

25        THE COURT:  Well, no.  It's not discretionary that I

1  have to get the guideline right, is it?

2          MR. PILGER:  Correct, correct.  I'm just getting to

3  the percentage departure issue.  So just starting from what

4  another judge of this court has done in terms of a departure

5  percentage --

6          THE COURT:  Okay.

7          MR. PILGER:  -- Judge Jarvey effectively halved the

8  sentence --

9          THE COURT:  So he gave 50 percent of what your brief

10  called the offense level was?

11          MR. PILGER:  As calculated by the probation office,

12  yes, Your Honor.

13          THE COURT:  Okay.

14          MR. PILGER:  So if you start from there in terms of

15  percentages, the government is only asking for two to four

16  levels, depending upon how you calculate the guidelines.

17          THE COURT:  Okay.

18          MR. PILGER:  So we're at a fractional percentage in

19  terms of what the 5K is asking for.

20          THE COURT:  Okay.  Thanks very much.

21          Mr. Brown, any additional comment beyond what you put

22  in your brief about the departure request by the government?

23          MR. BROWN:  Your Honor, at this time I would offer

24  what I've filed under seal as Exhibits A through F2 and ask that

25  they remain under seal as they relate to in part information

1  related to family circumstances and also in relation to his

2  cooperation and ask that the court admit those exhibits.

3                              (Defendant's Exhibits A through

4                              F2 were offered in evidence.)

5          THE COURT:  Mr. Brown, I'm troubled by -- I don't have

6  any problem with the exhibits being under seal.  Do you think

7  your brief should be under seal?

8          MR. BROWN:  What's that?

9          THE COURT:  This is a public proceeding after all.

10  I'm just curious.  What is your sense of that?

11          MR. BROWN:  The brief would not have to be under seal,

12  Your Honor.

13          THE COURT:  All right.  Mr. Pilger, does the

14  government have any objection to the exhibits that Mr. Brown has

15  offered?

16          MR. PILGER:  No, Your Honor.

17                              (Defendant's Exhibits A through

18                              F2 were received in evidence.)

19          THE COURT:  And, Mr. Brown, while you're at it, do you

20  want to offer the nine letters that I read into the record as

21  part of the submission?

22          MR. BROWN:  Yes, Your Honor.  Thank you.

23          THE COURT:  All right.  And, Mr. Brown, I don't know

24  of any other departure motions, do you?

25          MR. BROWN:  There is no other departure motion under

1   the guidelines.  We've requested a variance.

2           THE COURT:  Yeah, we're going to talk about variance

3   now.

4           MR. BROWN:  All right.

5           THE COURT:  So, Mr. Pilger, I'll hear from you on what

6   you think is the appropriate variance in the case, if any.

7           MR. PILGER:  So as laid out in our brief, Your Honor,

8   we would request a variance down to a level that allows you to

9   impose a sentence of probation.  So depending on your final

10  guidelines calculation, we would ask you to come down into

11  zone A.  And, again, that reflects the starting position of the

12  other judge of this court as to the related defendants.  It

13  amounts to slightly more than a 50 percent reduction.  And as

14  stated in our brief, we believe this is entirely justified by

15  the early and complete and truthful cooperation of Mr. Sorenson

16  with the related proceedings.

17          To reiterate, Mr. Sorenson shortly after a search was

18  conducted on his home retained Mr. Brown, came in quickly.  He

19  had initially in the course of the search proceedings, it must

20  be noted, made some generalized false statements to the FBI

21  about not having done anything wrong.  He retained counsel and

22  quickly came in, and from his first proffer session, his account

23  to the government was totally consistent with all of the other

24  evidence we developed.  That was both the evidence we had at the

25  time of the proffer and the evidence that we developed in

1    testing Mr. Sorenson's veracity as we developed the case and

2    continued before the grand jury and charged it.

3            His testimony before the grand jury and his extensive

4    testimony in two trials before this court was also entirely

5    consistent with all of the other evidence.  There were, of

6    course, instances where Mr. Sorenson recalling matters from

7    years ago in a chaotic campaign environment had some

8    recollections that we thought might be wrong, were wrong.  We

9    did not attempt to correct Mr. Sorenson on that.  His testimony

10   was his testimony.  He was cross-examined on that.  But these

11   were the usual detailed matters that witnesses tend to have

12   memory trouble with, and they were immaterial.  In fact, they

13   were trivial.

14           The defense tried to make much of them during the

15   other proceedings, if Your Honor might have reviewed that

16   record, and got nowhere with it.  That is because in every

17   material point we believe Mr. Sorenson's testimony was complete

18   and truthful and extremely helpful to the government.

19   Mr. Sorenson's testimony was critical on points which we could

20   not obtain from any other source.

21           Specific examples include the content of the

22   conversation had the day after the Bachmann Campaign accused,

23   correctly accused the Paul Campaign of buying Mr. Sorenson's

24   endorsement.  The content of that conversation at the campaign

25   headquarters here in Iowa of the Ron Paul operatives came only

1  from Mr. Sorenson.  There was no other source for the content.

2  Now, it was corroborated by some phone records and some other

3  things that we could do to show that the conversation had

4  happened at the time and with some of the people that we said,

5  but Mr. Sorenson's testimony was credited by the jury in finding

6  that the scheme to use the FEC, to weaponize it in protecting

7  the Paul Campaign from exposure for what they had done, that

8  came from Mr. Sorenson and the jury believed it.

9          All the other evidence is consistent with that.  It

10  was extremely helpful.

11          Another example, the day before that meeting where the

12  conspiracy effectively gets going to use the FEC, Mr. Sorenson

13  is the only source of information as to Mr. Benton, the campaign

14  chair, the top ranking operative in the Paul Campaign.

15  Mr. Sorenson is the only source for the statement by Mr. Benton

16  at a Ron Paul Campaign event when Mr. Sorenson endorsed

17  Mr. Paul.  Mr. Sorenson is the only source for Mr. Benton

18  saying, "You're bleeding for us, we'll take care of you," very

19  important evidence for the conviction of Mr. Benton.

20          So with that, Your Honor, we believe the variance that

21  we have requested and the sentence we have requested,

22  constrained by what the court has already done with the

23  co-defendants, which I must note for the record that the

24  government did not agree with --

25          THE COURT:  Right.  And let me, when you say

1  constrained by what the other sentences did, when your

2  footnote -- I was struck by your footnote which refers to the

3  radical departures.  Is it a radical -- it was a radical

4  variance, wasn't it?

5          MR. PILGER:  If I wrote departure, I was incorrect; it

6  was a variance.

7          THE COURT:  I think you did.  I may be incorrect about

8  that, but it seemed to me that what you were arguing was that

9  the sentences to Tate, Benton, and Kesari were a radical

10  variance.  Is that what you're arguing today?

11          MR. PILGER:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. PILGER:  I mean, with the greatest respect to the

14  other judge of this court --

15          THE COURT:  Right.

16          MR. PILGER:  -- the government disagrees with that

17  variance.

18          THE COURT:  Okay.

19          MR. PILGER:  The government's position is that

20  shouldn't have happened, but it did.  And with respect, we

21  believe that in order to effectuate the policy behind the 5K

22  departure and to show people in Mr. Sorenson's position that

23  their cooperation is worth it, that all that Mr. Sorenson went

24  through with us taking over his life, telling him when and where

25  to be, making him go over and over things with grand jury and

1  two trials, with the necessaries of preparation, people aren't
2  going to do that.  The goal of 5K is not going to be met if they
3  see that the more culpable defendants who didn't plead guilty,
4  who went and took the court to trial, for two trials, if they
5  see that that kind of defendant gets a lighter sentence than the
6  cooperator, that will completely undermine what we need to show
7  the world about the value of cooperation with the government.
8            THE COURT:  Mr. Pilger, the maximum sentence here for
9  Mr. Sorenson is 25 years, right?  Five years on the false FEC
10  filing, 20 years for obstruction of justice.  Is that what the
11  co-defendants were facing as well, or were they facing lesser
12  time than that, or do you know?
13            MR. PILGER:  I do know that, Your Honor.
14            THE COURT:  Yeah.
15            MR. PILGER:  So I can see how you arrive at that, and
16  that's by stacking consecutive sentences under the statutory
17  maximum.
18            THE COURT:  Well, I think that's what the plea
19  colloquy indicated, that he -- "he," Mr. Sorenson -- understood
20  that his exposure on this sentence was 25 years.
21            MR. PILGER:  That's absolutely right, and the
22  co-defendants actually faced higher amounts --
23            THE COURT:  Okay.
24            MR. PILGER:  -- if you stack consecutive sentences
25  because they faced more counts.

1              THE COURT:  Okay.

2              MR. PILGER:  And so it would be five years on each

3    count of conviction, except the 20 years on the obstruction

4    count.

5              THE COURT:  Okay.  Now, Mr. Pilger, I think I

6    interrupted you when you were talking about radical departures

7    or variances.  I got off on that.  So had you completed your

8    thought?  I didn't want to interrupt you.

9              MR. PILGER:  I think so.  And I stand corrected, the

10   proper term is variance.

11             THE COURT:  Okay.

12             MR. PILGER:  It is, it was, the government disagreed

13   with it at the time.  We pointed you at what remains I think a

14   sealed filing, although we're trying to get them all unsealed,

15   that shows why we thought that was wrong.

16             THE COURT:  Okay.

17             MR. PILGER:  But Judge Jarvey has ruled on that.

18             THE COURT:  Right.

19             MR. PILGER:  And with the greatest respect, that is

20   the sentence of the court in that case.

21             THE COURT:  Right.

22             MR. PILGER:  So in these proceedings, where we have to

23   show the world that cooperating with their government can have a

24   result that's fair, that's motivating --

25             THE COURT:  Right.

1          MR. PILGER:  -- we believe that that means to inform

2   the court, and we're constrained to recommend what we have.

3          THE COURT:  And the court needs to apply 3553(a),

4   doesn't it?

5          MR. PILGER:  Of course.

6          THE COURT:  Okay.  Mr. Brown, did you have any

7   additional comments beyond those contained in your brief?

8          MR. BROWN:  Your Honor, one of the things the court

9   asked us to do was to try to find comparative cases in other

10  campaign-related matters.  We attempted to do that the best I

11  could via Westlaw.

12          I think the main thing I found out was in the majority

13  of cases involving campaign crimes, it involves illegal

14  contributions or conduit schemes, and that isn't what happened

15  here.

16          THE COURT:  Right.

17          MR. BROWN:  This was a false report, and then when

18  Mr. Weinhardt was asking Mr. Sorenson questions about whether or

19  not he had been paid by the campaigns, he lied about that,

20  knowing that there was a federal inquiry at the time.

21          So, unfortunately, that research wasn't very helpful.

22          Your Honor, Kent Leroy Sorenson disgraced himself.  He

23  disgraced the Senate, the Iowa Senate.  And many men along the

24  way disgrace themselves but not often do they acknowledge it and

25  attempt to make -- reconcile that with what the truth is.

1  Mr. Sorenson publicly in a plea and in two trials admitted his

2  lies, the disgrace that he put on Iowa voters and the Senate.

3  He appeared in front of a federal grand jury and two federal

4  trials.  He told the court he wished he had never ever gotten

5  involved in politics.

6          This is clearly a man who rose too close to the sun

7  and beyond his ethical tethers, frankly; but he has taken a look

8  at himself, his politics, his policies, and I believe

9  Mr. Sorenson, if you read his wife's affidavit, which I'm sure

10  you have, and the letter from his employer, he knows what's

11  important in his life.  It's not fame, it's not politics, it's

12  not issues.  It's family.

13          And this has been a long three years, for both he and

14  I, not knowing what's going to happen.  As Mr. Pilger said, you

15  know, the government took control of his life, and it's not his

16  fault that this has been almost four years since he committed

17  these crimes.  He could have decided not to cooperate and taken

18  his punishment three-and-a-half years ago; but he did the right

19  thing.  He told the truth whenever asked.

20          And I respectfully submit that it doesn't take any

21  radical decision to impose probation in this matter.  Public

22  disgrace is a form of punishment.  He's a convicted felon.

23  Probation is punishment.  And I ask the court to impose a

24  sentence of probation and a hundred hours of community service

25  and whatever other terms and conditions that the court deems

1  appropriate.

2          THE COURT:  Thank you.

3          MR. BROWN:  Thank you very much.

4          THE COURT:  Mr. Sorenson, I'm sure Mr. Brown has told

5  you, under our rules and really common law tradition, you have

6  an opportunity to make a statement in allocution.  You don't

7  have to say anything; but you may if you wish.

8          Do you want to say anything?

9          THE DEFENDANT:  Yes, Your Honor.  I spent the other

10 night writing a statement because I didn't want to rattle on

11 going through the motions, so I would like to read that.

12         THE COURT:  Mr. Sorenson, we've got plenty of time,

13 and you shouldn't worry about rattling on.  When you hurry doing

14 legal work -- and I know both Mr. Pilger and Mr. Brown have

15 commented on this that it's been a long time.  When you hurry

16 doing legal work, we judges and lawyers tend to make mistakes.

17 So you shouldn't worry about, quote, rattling on.

18         THE DEFENDANT:  Thank you, Your Honor.

19         Well, Your Honor, I come to you today a far different

20 man than I was six years ago when I first entered the arena of

21 the presidential race in 2011.  Then I was cocky, arrogant, and

22 filled with misguided ideas.  Today I'm before you humbled and

23 broken.

24         Looking back, I realize the missed opportunities I had

25 to help so many people with compassion rather than that attitude

1  that I had.  I am filled with regret.  I don't even know where

2  to start.  So I'll just make an open apology to the people of

3  Iowa, to my former colleagues in the Legislature.  I

4  specifically want to apologize to Mr. Weinhardt who conducted

5  the Senate Ethics Investigation.  I became so skewed in my

6  thinking that I put politics before the truth.

7           I feel terrible that my father spent the last five

8  months of his life, after being diagnosed with stage four lung

9  cancer, watching his son plead guilty to these charges and being

10 more concerned about me than his own health.  I'm sorry to my

11 mother and my sisters for watching that play out.

12          I'm sorry to my wife and six children for putting them

13 through this during the last six years.  The youngest two have

14 dealt with this half their life, and my middle two have had

15 their teenage years consumed by this.

16          While there's no way to take back the decisions I

17 made, I have tried to begin to right them.  This is an ongoing

18 process, and my first step was when I came in to cooperate with

19 the FBI and Department of Justice.  I know that this will be a

20 lifelong process and some people will never trust me again.  I

21 hope that through my cooperation, Your Honor, that you see that

22 my intentions are true and my regrets sincere.

23          THE COURT:  The record should show the court has read

24 the presentence report, the exhibits offered by the defendant,

25 the motion for departure by the United States, the oral

1　arguments of the parties, the defendant's statement and

2　allocution.

3　　　　The court is now charged with fashioning a sentence

4　that is, quote, sufficient but not greater than necessary under

5　18, United States Code, Section 3553(a).  The court will first

6　determine the advisory guidelines range, then consider the

7　3553(a) factors, and finally rule on the government's motion for

8　departure.

9　　　　The advisory United States sentencing guidelines

10　range.  The presentence investigation report calculates

11　defendant's base offense level at 8 -- and that's on a scale of

12　43 -- and a total offense level as a result is 20, with upward

13　adjustments based on the value of the illegal transactions, here

14　the receipt of the money from the Bachmann and Paul campaigns,

15　abuse -- that's an eight-level increase; abuse of public trust,

16　which is a two-level increase; and obstruction of justice, that

17　is, the lying about his involvement, that's a two-level

18　increase.

19　　　　Pursuant to the defendant's motion, the court applies

20　the adjustment for acceptance of responsibility and, therefore,

21　reduces the offense level by three.  The defendant's obstructive

22　conduct was methodical and not in any way aberrant.  But his

23　cooperation with the government, as pointed out by each counsel,

24　in prosecuting the Paul Campaign staffers' case was significant.

25　　　　This case is an extraordinary one where the court is

1 both applying the obstruction of justice, which is unobjected to

2 by either the government or the defendant, and the acceptance of

3 responsibility adjustments apply.

4          The court denies the defendant's motion to adjust the

5 calculation or vary from the guideline range by deducting the

6 money he accepted from the Bachmann Campaign as, quote, fair

7 market value of his work.  The money was a central part of the,

8 quote/unquote, illegal transaction of intentionally hiding

9 income from the FEC contemplated by the sentencing guidelines.

10          The defendant's total offense level is 17.  His

11 criminal history category is I.  The guidelines recommended

12 sentence is 24 to 30 months, one to three years supervised

13 release, a fine of 10,000 to 95,000 dollars, and a $100 special

14 assessment payable to the Crime Victims Fund.

15          3553(a) factors.  The record should show the court has

16 considered all of these factors, the nature and circumstances of

17 the offense and the history and characteristics of the

18 defendant.  The court has also considered the need for a

19 sentence to be imposed that will reflect the seriousness of the

20 offense, a sentence that will promote respect for the law and

21 provide just punishment for the offenses defendant has

22 committed.

23          Additionally, the sentence must afford adequate

24 deterrence to criminal conduct, protect the public from further

25 crimes of the defendant, and provide the defendant with any

1   needed educational or vocational training, medical care, or

2   other correctional treatment in the most effective manner.

3           The kinds of sentences available.  The court believes

4   imprisonment, home confinement, and probation are sentences that

5   are available to the court.  The sentencing range is established

6   by the Sentencing Commission and then any policy statements by

7   the Sentencing Commission.

8           After its exhaustive review of the record, the court

9   finds that the most important of the 3553(a) factors in this

10  case are the nature, circumstances, and seriousness of the

11  offenses; the need to deter criminal conduct and promote respect

12  for the law; and the need to avoid unwarranted sentencing

13  disparities among similarly situated defendants.

14          The nature and circumstances and the seriousness of

15  the offenses.  Defendant's offense is the definition of

16  political corruption.  Professor Zephyr Teachout writes, quote,

17  corruption exists when institutions and officials charged with

18  serving the public serve their own ends, end of quote.

19  According to the Pew Research Center, 74 percent of Americans

20  believe that, quote, elected officials put their own interests

21  ahead of the country's, end of quote.

22          For the founders of our country, corruption was a

23  national fixation, the avoidance of which was, quote, an

24  essential organizing principle of our representative democracy.

25  Professor Teachout recounts that the founders tried to, quote,

create a system that would most likely be filled with men of
civic virtue but avoid creating temptations that might corrode
that virtue, end of quote.  America has historically maintained
its severe outlook on political corruption.  President Theodore
Roosevelt, speaking to the Congress in 1903, said, quote, There
can be no crime more serious than bribery.  Other offenses
violate one law while corruption strikes at the foundation of
all law.  Government of the people, by the people, for the
people will perish from the face of the earth if bribery is
tolerated.

There is no doubt that defendant's conduct is
corruption under any definition of the term.  In McCutcheon
versus Federal Election Commission, Chief Justice Roberts,
speaking for the Supreme Court, reiterated that, quote, The
hallmark of corruption is the financial quid pro quo:  dollars
for political favors.

Defendant's conduct is the opposite of civic virtue
and, therefore, requires a substantial sentence.  A sentence of
probation would not reflect the seriousness of defendant's
offenses.  It would erode America's foundational rejection of a
tolerance for corrupt governance.  The people require that
tangible and severe consequences meet those who abuse the public
trust for personal gain.  Unless that traditional principle is
honored, political corruption will slowly erode the foundations
of our democracy until it collapses under its own weight.

Deterring criminal conduct and promoting respect for the law. When a corrupt officeholder receives too lenient of a sentence, the public understandably loses confidence in the integrity of its system of government. And it sends a signal to other officeholders that they can have a free bite at the apple when it comes to accepting money for political favors.

In United States versus Morgan, the Tenth Circuit concluded that a sentence of probation in a corruption case involving an Oklahoma State Senator was unreasonable and, quote, encouraged rather than discouraged public officials from engaging in bribery because they might conclude that the only penalty they will face if they are caught is probation, end of quote. Sentencing corrupt officeholders to a colloquial slap on the wrist will exacerbate an endemic cycle of corruption.

A strict sentence also serves to protect the victims of political corruption from further harm. Judge Caproni of the Southern District of New York recently noted in a corruption case that, quote, Whether or not there was any tangible harm, there was incalculable intangible harm to the people, end of quote.

Through his actions the defendant has demeaned the integrity and work ethic of many public servants in his community who strive each day to improve life and governance for their fellow Iowans. As he has damaged the political morale of his constituency, of all Iowans, and of all Americans, the

1  public is also harmed when the corrosive influence of money in

2  our politics creates a political climate so corrosive that

3  people of good character aren't even willing to enter into

4  public service.

5       Avoiding unwarranted sentencing disparities.  The need

6  to avoid unwarranted sentencing disparities is perplexing in

7  this case due to the nature of the sentences imposed on Tate,

8  Benton, and Kesari following their convictions.  The court

9  agrees that the sentencing of defendant's co-conspirators must

10  be considered, but it concludes that those sentences do not

11  require a similar sentence in this case.

12       The government claims that the court, quote,

13  effectively halved the offense level of, end of quote, each of

14  the three staffers' offense level calculations under the

15  guideline.  The government suggests the same methodology be

16  applied to the defendant.

17       It is not clear that any sentencing conclusions were

18  reached by halving any number, and the government appears to

19  believe its own recommendation, or at least the prospect of

20  halving the total offense level here, would be radical and below

21  the appropriate sentence in similar cases.  The government

22  adamantly denies the analysis should apply in any other case,

23  including the staffers, except this case.

24       As to the disparities with other defendants, the cases

25  the government has cited have all resulted in significant terms

1    of incarceration of at least 27 months.  See Braddock, 38

2    months; Danielczyk, 28 months; I'll spell the next one

3    B-I-G-I-C-A, 60 months; Magliocchetti, 27 months.  Based upon

4    the results in those and other federal cases -- and the court

5    has looked at other cases as well, including the United States

6    versus Silver, Southern District of New York; United States

7    versus Pan, Southern District of New York; United States versus

8    Odom, Northern District of Florida; United States versus Feiss,

9    F-E-I-S-S, Southern District of Florida; United States versus

10   Tigani, District of Delaware; United States versus Whittemore,

11   District of Nevada.

12          The Paul cases -- based on those results, the court

13   declining to impose a term of incarceration in this case would

14   create an unwarranted sentencing disparity.  The Paul staffer

15   sentences are the exception, not the rule, for similarly

16   situated defendants.

17          In Gall versus the United States, Justice Stevens held

18   it is instructive to consider the 3553(a)(6) factor in the

19   inverse as the, quote, need to avoid unwarranted similarities

20   among other co-conspirators who were not similarly situated, end

21   of quote.  The staffers were not similarly situated to the

22   defendant.  The defendant was the recipient of illicit funds.

23   The three campaign staffers did not personally receive any of

24   the funds at issue.  And the defendant was a publicly elected

25   official at the time of his offense conduct, with the immense

1   burden and privilege of stewarding the public trust.  The

2   campaign staffers were not.

3           The court is challenged now with crafting a sentence

4   in the entirely unique circumstances of this case.  According to

5   the United States Sentencing Commission's records, United States

6   Sentencing Guideline 2C1.8 has been applied only 59 times in the

7   last decade and not once to an elected official.  To my

8   knowledge then, Mr. Sorenson is the only elected official

9   sentenced under 2C1.8 in the last ten years.

10          In light of these unique facts, the court concludes

11  the need to avoid unwarranted sentence disparities does not

12  compel a sentence with no term of incarceration.

13          Just punishment for the offense.  A term of

14  incarceration is required to reflect the seriousness of the

15  offense, to espouse respect for anticorruption laws, and to

16  deter systemic political corruption.  As Roosevelt said in his

17  1903 address, quote, The exposure and punishment of public

18  corruption is an honor to a nation, not a disgrace.  The shame

19  lies in toleration, not in correction.  The first requisite of

20  successful self-government is unflinching enforcement of the law

21  and the cutting out of corruption, end of quote.

22          The court agrees with Judge Caproni of the Southern

23  District of New York.  Quote, There's so much money sloshing

24  around government right now that it's very difficult to have

25  confidence that any decision is being made on the merits.  That

1   doubt about whether our public servants are operating in our

2   interests or whether their vote is available for purchase to the

3   highest bidder is magnified every time we see another

4   officeholder exposed as corrupt, end of quote.

5          The defendant has filed numerous letters of support

6   and requests for leniency for the sake of his family.  The court

7   is, of course, sympathetic toward those who will be adversely

8   affected by defendant's incarceration, most notably his spouse,

9   children, and extended family.  However, incarceration is a

10  foreseeable result of defendant's conduct.  Defendant cannot

11  escape an otherwise just sentence by referring to the victims of

12  his behavior to invoke undue sympathy.

13         Defendant claims his reputation has been damaged and

14  his family are in financially dire straits.  These collateral

15  consequences should not in this case afford defendant any

16  leniency in sentencing.  The First Circuit Court of Appeals has

17  held that it is, quote, impermissible for a court to impose a

18  lighter sentence on white-collar defendants than on blue-collar

19  defendants because it reasons that white-collar offenders suffer

20  greater reputational harm or have more to lose by conviction,

21  end of quote.  And the Tenth Circuit in the Morgan case that

22  I've referred to earlier has held that consideration of such

23  circumstances, quote, impermissibly favors criminals with

24  privileged backgrounds, end of quote.

25         The court also notes that the Congress of the United

1    States has determined violations of the statutes that defendant

2    has now been convicted of carry with it substantial sentences.

3    Not only -- and last week the Chief -- two weeks ago the Chief

4    Justice referred to this as well.  The court is guided by the

5    sentencing statutes of Congress as well as the sentencing

6    guidelines.  The convictions here carry a maximum sentence if

7    served consecutively of 25 years.  The first count is a

8    five-year maximum sentence; the second, the obstruction of

9    justice, 20 years.  The guidelines recommend 24 to 30 months.

10          The guideline range is relatively not in conformance

11    with the statute because of similar work by the Sentencing

12    Commission.  However, the court determines that political

13    corruption is a threat to our democratic system of governments,

14    and the court, therefore, concludes that 24 months incarceration

15    is just punishment for the offense.

16          Considering the government's motion for departure.

17    The government has filed a motion for downward departure

18    pursuant to 5K1.1.  Defendant's assistive role in the

19    government's prosecution of Benton, Tate, and Kesari is not

20    disputed.  The government characterizes defendant's testimony

21    as, quote, indispensable, end of quote, to its success in those

22    prosecutions and asserts his testimony was, quote, truthful,

23    complete, and reliable, end of quote.  Defendant's cooperation

24    was extensive as described by counsel, including grand jury and

25    trial testimony, debriefings, FBI interviews, trial preparation.

1    A departure from the sentencing guidelines range is warranted,

2    and the motion of the government is granted.  The court shall

3    reduce the defendant's term of incarceration by 35 percent to 15

4    months.

5            It is the judgment of the court that the defendant be

6    sentenced to a term of imprisonment of 15 months in the custody

7    of the United States Bureau of Prisons as a result of his

8    convictions of Counts 1 and 2 of the information filed on

9    August 27, 2014.

10           Mr. Brown, I'm assuming the defendant wants to be

11   placed in a federal prison as near the state of Iowa as

12   possible?

13           MR. BROWN:  That's correct, Your Honor.

14           THE COURT:  The court recommends that the defendant be

15   placed in a federal prison as near the state of Iowa as

16   possible.

17           Mr. Sorenson, there are no federal prison facilities

18   in Iowa, so I am recommending to the BOP that they place you as

19   near the state of Iowa as possible.  I don't control what the

20   Attorney General does.  Once the Attorney General receives the

21   court's commitment order, they will determine the appropriate

22   institution for you to be placed.

23           Upon release from imprisonment, the defendant shall be

24   on supervised release for a term of one year on Counts 1 and 2

25   of the information filed August 27, 2014, both counts to be

1    served concurrently.

2            Mr. Pilger and Mr. Brown, if you would look at your

3    presentence report, beginning on paragraphs 109 to 112, it's my

4    intention to place those paragraphs in the judgment and

5    commitment order unless you want to make some record on why they

6    wouldn't be appropriate in this case.

7            MR. BROWN:  As to the (a)(1), nature and

8    circumstances, other than my argument regarding the total amount

9    of money, Your Honor, I have no objection to those being

10   included.

11           THE COURT:  Okay.

12           MR. PILGER:  The government does not object.

13           Your Honor, if I may?

14           THE COURT:  Yes, Mr. Pilger.

15           MR. PILGER:  I feel that I must point out a couple of

16   things, having heard the court's analysis and understanding the

17   court's sentence; but before the end of these proceedings, I

18   feel like these two points must be made.

19           THE COURT:  Okay.  I'm not done.

20           MR. PILGER:  Not done; I'll wait, Your Honor.  Sorry.

21           THE COURT:  That's all right.

22           If the court is wrong on the guideline, the court

23   would still believe that 15 months is the appropriate sentence

24   based upon the nature and circumstances of the offense and the

25   history and characteristics of the defendant, as well as the

1  just punishment and seriousness of the offense are concerned.

2          The court also orders the defendant to pay a $100

3  special assessment to the Crime Victims Fund based upon what

4  the -- I'm sorry; $200 to the Crime Victims Fund on behalf of --

5  pay $200 to the Clerk of Court on behalf of the Crime Victims

6  Fund.  Based on what the court believes is the defendant's

7  financial condition, there's no other fine or penalty due.

8          Now, Mr. Pilger, I'm sorry.

9          MR. PILGER:  Thank you, Your Honor.

10          I don't disagree with anything that the court said.

11  In fact, in terms of the analysis of bribery and public

12  corruption understood as quid pro quo bribery --

13          THE COURT:  Right.

14          MR. PILGER:  -- Professor Teachout's book is excellent

15  on the subject, and I'm familiar with all of the authorities

16  Your Honor cited, and I could not agree more with the analysis

17  of the effect of bribery.  But as we said, as I said personally

18  in two opening statements and as we argued throughout the

19  related proceedings, bribery is not charged here.  Bribery is --

20          THE COURT:  I didn't say it was.  To me he made a

21  change in his political affiliation for money, and so to me

22  that's the common law definition of bribery.  I didn't say it

23  was a statutory charge here.  What he's convicted of is causing

24  a false financial report to be filed with the FEC under now

25  Title 2, 52, and obstruction of justice.

1        MR. PILGER:  Yes, Your Honor, and I don't want to

2   quarrel with the court.

3        THE COURT:  No, I want you to make whatever record you

4   want to make, Counsel.

5        MR. PILGER:  The only thing I would point out to you

6   is what you're pointing at in terms of the exchange of the

7   political endorsement, which is not a vote, and Your Honor

8   talked about votes, and I've prosecuted more cases than I can

9   remember where votes were bought.

10       THE COURT:  Right.

11       MR. PILGER:  This was not the sale of a vote.  This

12  was a sale of a political endorsement.  And the Criminal Code of

13  the United States addresses this in a seldom used statute, I

14  believe it's 18 U.S. Code 599, which is a misdemeanor, and which

15  we did not feel warranted the court's attention in the charging

16  of these matters because it is treated so leniently by the Code.

17       The nature of this case -- and this is my second

18  point -- is it's a transparency violation.  It is weaponizing

19  the FEC to conceal things that the public has a right to know.

20  The nature of this case isn't the quid pro quo arrangement --

21       THE COURT:  Mr. Pilger, the nature of this violation

22  is corruption.

23       MR. PILGER:  Well, I won't quarrel with the court.

24       THE COURT:  Well, I mean, do you disagree with that?

25       MR. PILGER:  Well, as a person focused on campaign

1  finances, my primary mission for the last six years, this was an

2  important campaign finance transparency case which -- and this

3  goes to the main point, the main second point I want to make.

4  THE COURT:  Right.

5  MR. PILGER:  You're correct, it's unique and that the

6  cases that both sides have cited in response to your request

7  don't really go to this kind of case, this kind of transparency

8  violation on the expenditure side because this is the first one.

9  This is a novel case on bringing an expenditure side false

10  statement case.

11  THE COURT:  Right.

12  MR. PILGER:  I've heard the court.

13  THE COURT:  Okay.  Mr. Pilger, here is what I want to

14  tell you, though, because I think this is valuable because

15  transparency in sentencing is a huge part of our law as well.

16  When the Congress passes a statute saying that it's a felony if

17  you cause a false report to be filed with the Federal Election

18  Commission and then you commit that crime and then you cover up

19  what you did by lying throughout 2013 and '14 until the FBI raid

20  your house, that's corruption.

21  MR. PILGER:  I hear Your Honor.

22  THE COURT:  Yeah.

23  MR. PILGER:  I would only point out that the people

24  who really benefitted from this --

25  THE COURT:  Right.

1          MR. PILGER:  -- the people who were really out to get

2   something were the co-conspirators who make a tremendous living

3   by being successful at things like winning the Iowa Caucuses, a

4   hugely important kind of accomplishment in the political world

5   where these folks make so much money, and the real reason why

6   this offense happened was because they wanted to appear

7   successful.  They wanted to burnish their careers.  They wanted

8   something that their candidate, Ron Paul, wanted nothing to do

9   with, which was an endorsement to help them win.

10          THE COURT:  I agree.

11          MR. PILGER:  And with that, Your Honor, I've been

12   heard and defer to the court.

13          THE COURT:  All right.  Thanks very much.

14          Mr. Brown, I got an e-mail this morning from Doug

15   Statler of the United States Probation office telling me that

16   Mr. Sorenson has followed his conditions of release.  He in his

17   note to me refers to violations of October 10, 2014, an

18   information only violation report, which I know you're aware of,

19   and a July 22, 2015, information only violation.  And then at

20   the conclusion, Mr. Statler says, quote, the U.S. Probation

21   office recommends defendant be allowed to continue on the

22   condition of his bond as previously set by the court.

23          So I will permit the defendant the privilege of

24   self-reporting or he can go into custody today, whatever your

25   preference is, assuming the United States doesn't object to the

1  defendant self-reporting.

2        MR. PILGER:  No objection, Your Honor.

3        MR. BROWN:  We would request self-report, Your Honor.

4        THE COURT:  All right.  Mr. Sorenson, I'm going to

5  allow you the privilege of self-reporting to the federal

6  correctional institution that you're assigned by the Attorney

7  General.  Mr. Brown will probably hear from the probation office

8  about where that is.  What happens now is that Ms. Tady will

9  e-mail this report and judgment and commitment order to the

10 Attorney General or wherever she does her work, and you'll hear

11 about what institution you're going to be assigned to.

12        Mr. Pilger and Mr. Brown, other than telling

13 Mr. Sorenson about his right of appeal, are there any other

14 matters that the court has to attend to?

15        MR. PILGER:  I didn't hear the court make a finding on

16 the inability to pay a fine.

17        THE COURT:  I did say that.  I don't believe he has

18 the ability to pay a fine.  There's no fine involved.

19        MR. PILGER:  Just checking, Your Honor.

20        MR. BROWN:  No, Your Honor.

21        THE COURT:  All right.  Mr. Sorenson, this is now a

22 final judgment of the District Court.  You do have a right to

23 appeal the judgment to the Court of Appeals if you believe it

24 contains error.  If you want to take that appeal, you have to

25 file a written notice with the clerk of the district court

1 | within 14 days of today's date. You have to serve a copy of
2 | that notice on the United States Attorney's office or the Public
3 | Integrity Section, or perhaps both. Mr. Pilger's office is in
4 | Washington, D.C. If you want to take that appeal, as I say, you
5 | have to file a written notice. The law provides that if you
6 | want to take the appeal and you can't afford a lawyer to help
7 | you prosecute the appeal, I have to appoint a capable lawyer to
8 | represent you on the appeal.

9 | Mr. Sorenson, do you have any questions about this
10 | judgment that's been entered today or about your right of
11 | appeal?

12 | THE DEFENDANT: No.

13 | THE COURT: We'll be in recess.

14 | (Proceedings concluded at 11:35 a.m.)

1                    C E R T I F I C A T E

2           I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated.

6           That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to computer transcription under my direction and

9    supervision, and that the foregoing computer transcription pages

10   are a full and complete transcript of the shorthand notes so

11   taken.

12          Dated at Des Moines, Iowa, this 23rd day of February,

13   2017.

14

15

16

17                          /s/ Terri L. Martin
                            CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25